# Exhibit 8

Trials@uspto.gov                                      Paper 38
571-272-7822                               Entered: December 3, 2014


UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____


DISTINCTIVE DEVELOPMENTS, LTD, ELECTRONIC
ARTS INC., GAMELOFT S.E., HALFBRICK STUDIOS PTY
LTD., LAMINAR RESEARCH LLC, MOJANG AB, and
SQUARE ENIX, INC.,
Petitioner,

v.

UNILOC USA, INC. and UNILOC LUXEMBOURG S.A.,
Patent Owner.

_____

Case IPR2013-00391
Patent 6,857,067 B2

_____


Before JAMESON LEE, ALLEN R. MacDONALD, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.


CLEMENTS, *Administrative Patent Judge*.


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00391
Patent 6,857,067 B2

## I.    INTRODUCTION

Distinctive Developments, Ltd., Electronic Arts Inc., Gameloft
S.E., Halfbrick Studios Pty Ltd., Laminar Research LLC, Mojang AB,
and Square Enix, Inc. (collectively, "Petitioner") filed an Amended
Petition requesting *inter partes* review of claims 1, 20–22, 30, 31, 35,
67, 107, and 108 ("the challenged claims") of U.S. Patent No.
6,857,067 B2 (Ex. 1001, "the '067 patent").  Paper 11 ("Pet.").
Uniloc USA, Inc., and Uniloc Luxembourg S.A. ("Patent Owner")
filed a Preliminary Response.  Paper 14 ("Prelim. Resp.").  On
December 18, 2013, we instituted an *inter partes* review of claims 1,
20–22, 30, 31, 67, 107, and 108 on certain grounds of unpatentability
alleged in the Petition.  Paper 15 ("Dec. to Inst.").  After institution of
trial, Patent Owner filed a Patent Owner Response (Paper 22, "PO
Resp.") to which Petitioner filed a Reply (Paper 24, "Pet. Reply").

Oral argument was held on July 11, 2014.[1]

We have jurisdiction under 35 U.S.C. §§ 6(c) and 314.  This
Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and
37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has
shown by a preponderance of the evidence that claims 1, 20, 22, 30,
31, 67, 107, and 108 of the '067 patent are unpatentable, but has not
shown by a preponderance of the evidence that claims 21 and 22 are
unpatentable.

---

[1] A transcript of the oral hearing is included in the record as Paper 37
("Tr.").

2

IPR2013-00391
Patent 6,857,067 B2

### A. Related Proceedings

Petitioner indicates that the '067 patent was asserted against it in seven co-pending cases filed on July 20, 2012, and captioned (1) *Uniloc USA, Inc. v. Distinctive Developments, Ltd.*, Case No. 6:12-cv-00462 (E.D. Tex.); (2) *Uniloc USA, Inc. v. Electronic Arts, Inc.*, Case No. 6:12-cv-00463 (E.D. Tex.); (3) *Uniloc USA, Inc. v. Gameloft S.E.*, Case No. 6:12-cv-00466 (E.D. Tex.); (4) *Uniloc USA, Inc. v. Halfbrick Studios Pty Ltd.*, Case No. 6:12-cv-00467 (E.D. Tex.); (5) *Uniloc USA, Inc. v. Laminar Research, LLC*, Case No. 6:12-cv-00468 (E.D. Tex.); (6) *Uniloc USA, Inc. v. Mojang AB*, Case No. 6:12-cv-00470 (E.D. Tex.); and (7) *Uniloc USA, Inc. v. Square Enix, Inc.*, Case No. 6:12-cv-00472 (E.D. Tex.).  Pet. 58.

### B. The '067 Patent

The subject matter of the '067 patent relates to preventing unauthorized access to electronic data, such as computer software, music, movies, and e-books.  Ex. 1001, 1:11–13.  A portable licensing medium, which stores license data, is configured to communicate with the electronic device.  *Id.* at 3:63–65.  The license data is used by the electronic device to determine whether to allow access to the electronic data.  *Id.* at 3:65–67.  A registration authority is configured to communicate with the electronic device.  *Id.* at 3:67–4:1.  The registration authority has verification data for verifying the license data stored on the licensing medium.  *Id.* at 4:1–3.  The registration authority provides updated license data to the licensing medium.  *Id.* at 4:3–4.  Figure 1 is reproduced below:

3

IPR2013-00391
Patent 6,857,067 B2



Fig. 1

Figure 1 of the '067 patent depicts licensing medium 120 (for example, a Smart Card), client computer 100, registration authority 110, and vendor 130.  Registration authority 110 determines whether a given user is authorized to have access to a given piece of electronic data.  *Id.* at 6:48–50.  A client program installed on client computer 100 communicates with licensing information storage medium 120, referred to as the licensing medium, and with registration authority 110.  *Id.* at 6:63–66.  Registration authority 110, in turn, communicates with software vendor 130, which maintains a database of valid licenses issued for the electronic data.  *Id.* at 7:3–5.

Licensing medium 120 may be any type of portable electronic data storage medium that has a unique, unalterable serial number or other form of identification that can be transmitted electronically, such as a smart card, memory stick, magnetic strip card, floppy disk, or other removable computer storage media.  *Id.* at 7:13–18.  Licensing medium 120 may communicate with client device 100 using a wired or wireless connection.  *Id.* at 7:18–22.  In some embodiments, licensing medium 120 may be non-removable, such as an internal

IPR2013-00391
Patent 6,857,067 B2

random access memory (RAM) installed in a cellular phone.  *Id.* at
7:23–28.  In the embodiment depicted in Figure 1, licensing medium
120 is a smart card.  *Id.* at 7:32–33.

As disclosed in the Specification, registration authority 110 is a
remote server that maintains a licensing database containing
information for all of the licensing media 120 authorized by the
software protection administrator and all of the software licenses
authorized by the software vendors 130.  *Id.* at 7:62–66.

*C. Illustrative Claims*

Of the challenged claims, claims 1, 67, 107, and 108 are the
only independent claims.  Claim 1 is illustrative and is reproduced
below:

> 1.    A system for preventing unauthorized access to
> electronic data on an electronic device, the system
> comprising:
>
> a portable licensing medium configured to
> communicate with the electronic device and to store
> license data, the license data configured to be used by the
> electronic device to determine whether to allow access to
> the electronic data; and
>
> a registration authority configured to communicate
> with the electronic device, the registration authority
> having verification data for verifying the license data
> stored on the licensing medium,
>
> wherein the registration authority provides updated
> license data for the licensing medium.

IPR2013-00391
Patent 6,857,067 B2

### D. *Prior Art Supporting the Instituted Challenges*

The following prior art references were asserted in the instituted

grounds:

| | | | |
|---|---|---|---|
| Cronce | US 7,032,240 B1 | Apr. 18, 2006<br>(filed Feb. 14, 2000) | Ex. 1002 |
| Deluca | US 6,008,737 | Dec. 28, 1999 | Ex. 1004 |

### E. *The Instituted Challenges of Unpatentability*

We instituted this trial on the basis that Petitioner had

demonstrated a reasonable likelihood of showing claims 1, 20–22, 30,

31, 67, 107, and 108 are unpatentable based upon the following

grounds:

| Reference | Basis | Claims challenged |
|---|---|---|
| Cronce | § 102 | 1, 20, 31, 67, 107, and 108 |
| Deluca | § 102 | 1, 20–22, 30, 31, 67, 107, and 108 |

## II.   ANALYSIS

### A. *Claim Construction*

In an inter partes review, claim terms in an unexpired patent are

interpreted according to their broadest reasonable construction in light

of the specification of the patent in which they appear.  37 C.F.R.

§ 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756,

48,766 (Aug. 14, 2012).  Also, claim terms are given their ordinary

and customary meaning, as would be understood by one of ordinary

skill in the art in the context of the entire disclosure.  *In re Translogic*

*Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

6

IPR2013-00391
Patent 6,857,067 B2

1. *"verification data for verifying the license data" (claim 1)*

Claim 1 recites "verification data for verifying the license data." Claims 67, 107, and 108 recite limitations with commensurate scope. PO Resp. 21–22.

Patent Owner contends that a person of ordinary skill in the art would have understood "verification data for verifying the license data" as "data that allows the license data itself to be independently verified, for example, by one of the three [methods described in column 4, lines 5 to 26 of the '067 patent]." PO Resp. 16–17 (citing Ex. 1001, 4:6–9, 4:13–16, 4:22–26; Ex. 2002 ¶ 15).

Petitioner counters that Patent Owner's proposed construction is overly narrow because it excludes embodiments disclosed in the '067 patent in which the "verification data for verifying the license data" is a list of authorized identifiers.  Pet. Reply 1–2 (quoting Ex. 1001, 4:34–42).  Petitioner argues that claim 13, which depends from claim 1, specifies that "the verification data comprises a list of authorized identifiers," and, therefore, claim 1 necessarily encompasses embodiments in which a list of authorized identifiers are the recited "verification data."  *Id.* at 2–3.  Patent Owner's expert, Dr. Michael T. Goodrich, acknowledged that a list of authorized identifiers can be *included* in the "verification data," but testified that the list of authorized identifiers "would not exclusively be the whole of the verification data," because the verification data must be able to verify fully that the license data has not been tampered with.  Ex. 1013, 27:3–13, 32:11–14.

IPR2013-00391
Patent 6,857,067 B2

The '067 patent does not define either "verification data" or "verification data for verifying the license data stored on the licensing medium." The language of claim 1, however, specifies that the recited "verification data" is "for verifying the license data stored on the licensing medium." Patent Owner cites three methods described in the '067 patent (PO Resp. 15), but those methods verify the validity of the *licensing medium*, not of the license data. Ex. 1001, 4:6–26 ("The electronic device may verify the validity of the *licensing medium* by comparing the license data to the verification data of the registration authority." (emphasis added)); *see also* claims 2, 5, 9, 10 (reciting "verify validity of the *licensing medium* by . . ." (emphasis added)). Based on our review, the only disclosure in the '067 patent of a "verification" of license data is the disclosure that the license data (or a hash of it, or an encrypted hash of it) is compared to a copy of itself in the "verification data" of the registration authority. Ex. 1001, 4:6–26. In the context of the '067 patent, then, we construe "verifying the license data," as recited in claim 1, to mean comparing the license data to a copy of itself to confirm that the two match.

Claim 13 provides context for understanding the difference between "verification data" and "verification data for verifying the license data." Claim 13 specifies that "the verification data comprises a list of authorized identifiers that allow access to the electronic data." The list of authorized identifiers, however, is not compared to license data. It is compared, instead, to "registration information." Ex. 1001, 4:34–42; claim 14 ("when the identifier sent with the registration information corresponds to one of the authorized identifiers."). Thus,

IPR2013-00391
Patent 6,857,067 B2

a list of authorized identifiers may be sufficient to verify validity of a
*licensing medium*, such that the registration authority provides
updated license data, but the authorized identifiers cannot be used to
"verify" the license data because they are not a copy of the license
data with which the license data can be compared.  Accordingly, we
find persuasive the testimony of Patent Owner's expert, Dr. Goodrich,
that a list of authorized identifiers may be *included* in "verification
data," but cannot be "verification data for verifying license data,"
because the authorized identifiers cannot be used to verify the *license
data* by means of a comparison with it.  Ex. 1013, 27:3–13, 32:11–14.

　　　For the foregoing reasons, we construe "verification data for
verifying the license data" as "a copy of the license data with which
the license data can be compared."

　　2.　*"verification data" (claims 67, 107, and 108)*

　　　Unlike claim 1, which recites "verification data for verifying
the license data," claims 67, 107, and 108 recite "verification data"
without specifying a purpose for which it is used.  These limitations,
therefore, require that the registration authority have "verification
data," but do not require that the registration authority have
"verification data for verifying the license data."  As discussed above,
the '067 patent states clearly that "verification data" may include data,
such as a list of authorized identifiers, that are used to verify the
licensing medium. Ex. 1001, 4:34–42, Claim 13.  The '067 patent
describes the list of authorized identifiers as being compared to
registration information, not to license data.  Accordingly, Patent
Owner's proposed construction of "verification data" is overly narrow

9

IPR2013-00391
Patent 6,857,067 B2

because "verification data"—as opposed to "verification data for verifying the license data"—includes data, such as a list of authorized identifiers, that is not used to verify the license data itself.  Ex. 1001, 4:34–42, Claim 13.

    For the foregoing reasons, we construe "verification data" as "data including at least (1) a copy of the license data with which the license data can be compared; or (2) a list of authorized identifiers with which an identifier in registration information can be compared."

   *3. "provides updated license data" (claim 1) / "providing updated license data" (claims 67, 107, and 108)*

    Claim 1 recites "provides updated license data," and claims 67, 107, and 108 recite "providing updated license data."  Patent Owner contends that these phrases should be construed as "to modify existing data with new data in such a way that the existing data is brought up to date or made more current."  PO Resp. 26–29 (citing Ex. 2002 ¶¶ 24–29), 34.  Specifically, Patent Owner contends that "neither creating a new record nor deleting an existing record meets [this] limitation."  *Id.* at 26.

    Petitioner counters that (1) Patent Owner's proposed construction is overly narrow because the '067 patent discloses deleting license data as one way of updating license data; (2) the '067 patent does not define "updating" to have a special meaning; and (3) a person of ordinary skill in the art at the time would have understood "updating" to include deleting old license data and adding new license data.  Pet. Reply 10–13.

IPR2013-00391
Patent 6,857,067 B2

We agree that Patent Owner's proposed construction is overly narrow. The claim language requires only that the registration authority "provides" updated license data. The claim language does not specify to what the updated license data is provided—the portable licensing medium, the electronic device, or something else. It also does not specify whether, or how, the updated license data is used after it has been provided. Because the claim language does not require the *use* of the updated license data, it is improper to construe this term to require "modify[ing] existing data," as Patent Owner proposes.

Moreover, as Petitioner points out, the '067 patent describes embodiments in which the license data sent from the registration authority reflects the creation of new records:

> If the registration information is verified by the registration authority, then a new registration entry is created for the newly granted or updated license for the software. The registration authority generates *new smart card data reflecting these changes* and *sends the new data* back to the client computer to be stored on the smart card.

Ex. 1001, 9:56–65 (emphasis added). Thus, the '067 creates a "new registration entry" not just for a "newly granted" license, but even for an "updated" license. The '067 patent nowhere describes sending an "updated"—as opposed to "new"—registration entry. Accordingly, we are not persuaded that a newly-added software license cannot be "updated license data."

IPR2013-00391
Patent 6,857,067 B2

The '067 also describes an embodiment in which the license data sent from the registration authority reflects the deleting of old records:

> The registration authority sends *new smart card data* to the user reflecting *the removal* of the software license. Rather than deleting the entry on the smart card, the registration authority *may* change the software license expiration date to a date in the past.

*Id.* at 11:29–33 (emphasis added).  The "new smart card data" sent from the registration authority may reflect the deletion of the entry, or it may retain the entry but with an expiration date set to a date in the past.  Accordingly, we are not persuaded that data reflecting the removal of a software license cannot be "updated license data."

Patent Owner's reliance on a dictionary definition of "update" is unavailing.  As an initial matter, the claim language recites the adjective "updated," not the verb "update."  Even if we credited the dictionary definition by interpreting "updated" to mean "changed to make more current," that definition would still encompass data reflecting the addition of, or removal of, a software license, either of which make the "license data," as a whole, more current.

For the foregoing reasons, we construe "[provides/providing] updated license data" to encompass providing data reflecting the addition of, or removal of, a software license.

   *4.  "telephone" (claim 22)*

Claim 22 recites "wherein the licensing medium is not removable from the cellular telephone."  Patent Owner contends that the plain and ordinary meaning of "telephone" requires a device that has a microphone and is capable of two-way voice communication.

IPR2013-00391
Patent 6,857,067 B2

PO Resp. 32.  Petitioner counters that neither the specification nor the claims mention voice communication.  Pet. Reply 15.

The '067 patent does not define "telephone."  Patent Owner's expert, Dr. Goodrich, relies upon two definitions of "telephone," but neither Patent Owner nor Dr. Goodrich establish sufficiently that the definitions reflect the meaning of "telephone" at the time of the inventions.  PO Resp. 32 (citing Ex. 2002 ¶ 34).  We are persuaded, however, that a person of ordinary skill in the art at the time of the invention would have understood "telephone" to require both an earphone for use in a telephone system and a microphone for use in a telephone system.  *See* IEEE 100 - THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS 1158 (7th ed. 2000) ("telephone set (1) (telephone)," "telephone receiver," "telephone transmitter").

For the foregoing reasons, we construe "telephone" to require both an earpiece for use in a telephone system and a microphone for use in a telephone system.

B.  *Claims 1, 20, 31, 67, 107, and 108—Anticipation by Cronce*

Petitioner contends that claims 1, 20, 31, 67, 107, and 108 are unpatentable under 35 U.S.C. § 102(e) as anticipated by Cronce.  Pet. 9–22.

Patent Owner counters that Cronce does not disclose (1) a "registration authority having verification data for verifying the license data stored on the licensing medium," as recited in independent claim 1; (2) commensurate limitations recited in independent claims 67, 107, and 108; and (3) "wherein the licensing

13

IPR2013-00391
Patent 6,857,067 B2

medium is a random access memory," as recited in claim 20. PO
Resp. 16–25.

Upon consideration of the parties' contentions and supporting
evidence, we determine that Petitioner has demonstrated by a
preponderance of the evidence that claims 67, 107, and 108 are
anticipated by Cronce, but has not demonstrated by a preponderance
of the evidence that claims 1, 20, and 31 are anticipated by Cronce.

### *Cronce (Exhibit 1002)*

Cronce describes an authorization system and associated
method for selectively authorizing a host system to use one or more
items of protected information associated with the host system. Ex.
1002, Abstract, 3:44–47. The authorization system includes a
portable authorization device that is coupled removably to the host
system. Ex. 1002, Abstract, 3:47–49. The portable authorization
device is capable of receiving and storing multiple items of
authorization information associated with a plurality of respective
items of protected information from one or more information
authorities. Ex. 1002, Abstract, 3:49–53. Preferably, the portable
authorization device is capable of communicating with multiple types
of information authorities. Ex. 1002, Abstract, 3:53–55. The
portable authorization device of the present invention selectively
authorizes the host system to use the one or more respective items of
protected information based upon the respective authorization
information stored therein. Ex. 1002, Abstract, 3:56–59. Figure 1 of
Cronce is reproduced below:

IPR2013-00391
Patent 6,857,067 B2



FIG._1

As depicted in Figure 1, authorization system 100 is comprised of one or more access control programs 117 associated with host system 110, portable authorization device 140, and one or more information authorities 160, 180, and 185.  Ex. 1002, 4:58–61.  Authorization system 100 selectively authorizes host system 110 to use a plurality of items of protected information 115 associated with the host system.

*Claim 1*

Claim 1 recites a "registration authority having verification data for verifying the license data stored on the licensing medium." Petitioner contends that Cronce discloses a registration authority (information authority 160, 180, or 185) having verification data (identification information) for verifying the license data (authorization information 171 (in one embodiment, dynamic key selector 171)) stored on the licensing medium (portable authorization device 140).  Pet. 12–14 (citing Ex. 1002, 14:39–58, Fig. 9, Fig. 10); Pet. Reply 4–5.

Patent Owner counters that Cronce does not teach this limitation because Cronce compares fixed key ID 151 to identification

IPR2013-00391
Patent 6,857,067 B2

information *associated with* authorization information 171 (i.e., the recited "license data"), but not to the authorization information 171 itself.  PO Resp. 19–20.

We agree with Patent Owner that the "identification information" disclosed in Cronce is not "verification data for verifying the license data," as we have construed that term, because it is not used to verify the license data (i.e., authorization information 171).  Specifically, Cronce does not disclose, for example, a comparison of identification information with authorization information 171.  Instead, Cronce's "identification information" is compared only to fixed key ID 151, which Petitioner does not identify as the recited "license data" in its Petition.

In its Reply, Petitioner argues that fixed key ID 151 is "the license data," because the '067 patent defines that term broadly as "data that is used [ ] to determine whether or not to allow access to electronic data."  Pet. Reply 7–8 (citing Ex. 1001, 3:65–67; Ex. 2002 ¶ 12).  We do not agree, however, that "license data" has the meaning proposed by Petitioner.  Specifically, the sentence relied upon by Petitioner does not define "license data."  It states only that "license data is used by the electronic device to determine whether to allow access to the electronic data."  Ex. 1001, 3:65–67.  It does not state that *all* data used in the process of determining whether to allow access to electronic data is license data.  Even assuming that Cronce's fixed key ID 151 is used in the process of determining whether to allow access to Cronce's protected information 115, that is not sufficient for fixed key ID 151 to be the recited "license data."

16

IPR2013-00391
Patent 6,857,067 B2

Petitioner also argues in Reply that "there is a comparison between two pieces of information that, if successful, results in verified and updated license information being transmitted to the portable authorization device."  Pet. Reply 5.  Neither piece of information is "verification data for verifying the license data," however, unless it is compared with the license data itself.  Cronce discloses no such comparison between its identification information (i.e., the recited "verification data") and authorization information 171 (i.e., the recited "license data").

Petitioner also argues in Reply that Cronce discloses a second verification process in which the information authority (i.e., "registration authority") has a fixed secret key 152 (i.e., "verification data") that is compared to a fixed secret key 152 stored on the portable authorization device.  Pet. Reply 5–7.  As with the process relied upon in the Petition, however, Cronce does not disclose the use of fixed secret key 152 to "verify" authorization information 171 (which Petitioner identifies as the recited "license data"), such as by a comparison of the two to confirm a match.  Because fixed secret key 152 is not used to verify authorization information 171 it is not "verification data for verifying the license data," as we have construed that term.

In view of the foregoing, we conclude that Petitioner has not demonstrated sufficiently that Cronce discloses "the registration authority having verification data for verifying the license data," as recited in independent claim 1, and in claims 20 and 31 which depend therefrom.

IPR2013-00391
Patent 6,857,067 B2

*Claims 67, 107, and 108*

We are persuaded that the limitations of independent method claim 67, and of independent claims 107 and 108, which recite substantially the same limitations as claim 67, are met by Cronce. For example, Cronce discloses storing license data ("The portable authorization device 140 includes . . . a memory for storing the authorization information 171."), determining whether to allow access to electronic data based on license data ("The portable authorization device of the present invention selectively authorizes the host system to use the one or more respective items of protected information based upon the respective authorization information stored therein."), verifying the license data stored on the licensing medium ("The information authorities 160, 180 and 185 provide respective authorization information 171 for transmission to the portable information device 140 to authorize use of the items of protected information."), and providing updated license data to the licensing medium ("the portable authorization device 140 can be updated with new authorization information 171 from information authorities 160/180/185, as explained below."). Pet. 10–14 (citing Ex. 1002, 3:56–59, 5:17–25, 5:55–59, 5:35–43).

Patent Owner's argument that these claims are not anticipated by Cronce for the same reasons that claim 1 is not anticipated by Cronce (PO Resp. 21–22) is not persuasive. Unlike claim 1, these claims do not require that the "verification data" be "for verifying the license data." As discussed above, we construe "verification data" to encompass a list of authorized identifiers. As Petitioner points out,

18

IPR2013-00391
Patent 6,857,067 B2

Cronce discloses that "information authority 160/180/185 transmits identification information," and that "[i]n a preferred embodiment of the invention, the identification information is a number used to uniquely identify the item of protected information 115 authorized by the dynamic key selector 171." Pet. 13–14 (quoting 15:39–58) (emphasis removed). Because the "identification information" can be a unique identifier that allows access to protected information 115, it is "verification data." And because the information authority (i.e., "registration authority") is transmitting identification information (i.e., "verification data"), it necessarily has it. In view of the foregoing, we conclude that Petitioner has demonstrated sufficiently that Cronce describes a "registration authority having verification data."

We also are not persuaded by Patent Owner's argument that claims 107 and 108 are not anticipated because Cronce's comparison is carried out entirely on portable device 140 (i.e., the recited "portable licensing medium") rather than on host system 110 (i.e., the recited "electronic device"). PO Resp. 22–25. As Petitioner points out, these claim limitations do not require that the "code for verifying" perform a comparison; they require only that the "code for verifying" "communicate with [a] registration authority having verification data." Pet. Reply 10. Petitioner relies upon Cronce's disclosure of access control program 117 on host system 110 communicating with an information authority. *Id*; Pet. 12–14. In view of the foregoing, we conclude that Petitioner has demonstrated sufficiently that Cronce describes "code for verifying . . . by communicating with a registration authority" that is "executable on an electronic device."

19

IPR2013-00391
Patent 6,857,067 B2

*Conclusion*

For the foregoing reasons, we determine that Petitioner has established by a preponderance of the evidence that claims 67, 107, and 108 are unpatentable under 35 U.S.C. § 102(e) as anticipated by Cronce, but has not established by a preponderance of the evidence that claims 1, 20, and 31are unpatentable under 35 U.S.C. § 102(e) as anticipated by Cronce.

*C. Claims 1, 20–22, 30, 31, 67, 107, and 108—Anticipation by Deluca*

Petitioner contends that claims 1, 20–22, 30, 31, 67, 107, and 108 are unpatentable under 35 U.S.C. § 102(b) as anticipated by Deluca. Pet. 32–45.

Patent Owner counters that Deluca does not disclose (1) "provid[ing] updated license data," as recited in independent claim 1; (2) commensurate limitations recited in claims 67, 107, and 108; and (3) "wherein the licensing medium comprises a memory installed in a cellular telephone," as recited in claims 21 and 22. PO Resp. 25–35.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 20, 30, 31, 67, 107, and 108 are anticipated by Deluca, but has not demonstrated by a preponderance of the evidence that claims 21 and 22 are anticipated by Deluca.

*Deluca (Exhibit 1004)*

Deluca describes a method and apparatus for controlling utilization of software added to a portable communication device. Ex. 1004, Title, 1:12–15. Figure 1 of Deluca is reproduced below:

IPR2013-00391
Patent 6,857,067 B2



*FIG. 1*

Figure 1 of Deluca depicts a communication system comprising fixed portion 102 (i.e., controller 112 and base stations 116) and portable portion 104 (i.e., portable communication devices 122).  Ex. 1004, 2:3–11.  One portable communication device 122 receives a request for utilization of software.  Ex. 1004, Abstract.  In response, portable communication device 122 seeks authorization for utilizing the software by generating an external authorization request that includes at least one of a size of the software, a software name, a secure checksum, and an address identifying the portable communication device.  *Id*.  Portable communication device 122 then communicates the external authorization request to the fixed portion of the wireless communication system.  *Id*.  The authorization request is received by controller 112.

Controller 112 is comprised of processor 210, database of portable device records 216, and database of processes 226.  Ex. 1004, FIG. 2, 3:35–40.  Database of portable device records 216 contains a list of process records 220 for each portable communication device

21

IPR2013-00391
Patent 6,857,067 B2

122.  Ex. 1004, 3:40–43.  List of process records 220 specifies the software and hardware processes that are authorized for use by portable communication device 122 having portable device address 218.  Ex. 1004, 3:47–50.  Database of processes 226 comprises binary executables (machine code) of many of the authorized software processes available for use by portable communication devices 122. Ex. 1004, 3:58–61.

Authorization requests from portable communication device 122 are received by request receiver element 236 in ROM 228 of controller 112.  Ex. 1004, 5:6–11, 20–45.  Processor 210 searches database of portable device records 216 to find the list of process records 220 for that portable communication device.  Ex. 1004, 5:48– 53.  If a match is found, authorization is given to portable communication device 122 for using the requested software or hardware process.  Ex. 1004, 5:56–58.

*Petitioner's Contentions*

We are persuaded that the following limitations of independent claim 1 are met by the following elements of Deluca:

| *Independent Claim 1* | *Deluca* |
|---|---|
| a portable licensing medium | RAM 378 |
| license data | authorization records 380 |
| a registration authority | controller 112 |
| verification data | database of portable device records 216 database of process records 226 |

We also are persuaded that the limitations of independent method claim 67, and of independent claims 107 and 108, which

IPR2013-00391
Patent 6,857,067 B2

recite substantially the same limitations as claim 67, are also met by
Deluca.  For example, Deluca discloses storing license data ("RAM
387 further comprises authorization records 380"), determining
whether to allow access to electronic data based on license data
("When a user requests utilization of a hardware or software process .
. . the processor 308 calls on the authorization element 316 to process
the request."), verifying the license data stored on the licensing
medium ("In step 616 the encrypted external authorization request is
transmitted to the base stations 116."), and providing updated license
data to the licensing medium ("In response to obtaining an external
authorization allowing utilization of a process, the processor 308
accesses the creator element 344 to create an internal authorization
record 382.").  Pet. 42–25 (citing Ex. 1004, 7:31–8:5, 9:52–10:39,
15:5–45, and 10:30–11:60).

We also are persuaded that the limitations of dependent claims
20, 30, and 31 are met by Deluca.  For example, with respect to the
"random access memory" recited in claim 20, Petitioner cites
Deluca's disclosure of RAM 378.  Pet. 40 (citing Ex. 1004, 7:55–62;
Fig. 3).

### Patent Owner's Arguments

Patent Owner argues that Deluca does not disclose "wherein the
registration authority provides updated license data for the licensing
medium," as recited in claim 1, because it does not disclose "updated
license data," as Patent Owner construes that term.  PO Resp. 26–31.
Patent Owner argues that Deluca fails to disclose claims 67, 107, and
108, which recite limitations of commensurate scope.

IPR2013-00391
Patent 6,857,067 B2

Petitioner counters that (1) Patent Owner's proposed construction is too narrow; and (2) even under that construction, Deluca discloses updating an authorization record by replacing an expired authorization record with an authorization record directed to the same software having a new expiration date.  Pet. Reply 13–15.

We decline to adopt Patent Owner's proposed construction of "updated license data" for the reasons discussed above.  We construe "updated license data" to encompass providing data reflecting the addition of, or removal of, a software license.  Petitioner relies upon Deluca's disclosure of a base station/controller that provides an external authorization response message that processor 308 uses to update authorization record 380 by creating an internal authorization record 382.  Pet. 38–40 (citing Ex. 1004, 10:30–11:60).  In view of the foregoing, we conclude that Petitioner has demonstrated sufficiently that Deluca describes "[provides/providing] updated license data."

*Claims 21 and 22*

Claim 21 recites "wherein the licensing medium comprises a memory installed in a cellular telephone."  Claim 22 recites, "A system according to claim 21, wherein the licensing medium is not removable from the cellular telephone."

Petitioner relies upon Deluca's disclosure of RAM 378 in portable communications device 122.  Pet. 40–41.  Patent Owner argues that the Deluca's portable communications device 122 is not a "cellular telephone" because it is merely a pager that lacks a microphone to facilitate two-way voice communication.  PO Resp.

24

IPR2013-00391
Patent 6,857,067 B2

31–33.  Petitioner counters that Deluca discloses voice paging and the
ALOHA protocol.  Pet. Reply 15.

As discussed above, we construe "telephone" to require both an
earpiece for use in a telephone system and a microphone for use in a
telephone system.  We agree with Patent Owner that Deluca does not
disclose a microphone or other audio input for portable
communications device 122.  We are not persuaded that Deluca's
mention of voice paging in the Background of the Invention (Ex.
1001, 1:18–22) discloses that portable communications device 122
can be a telephone.  Likewise, we are not persuaded that the mention
of the ALOHA protocol (*Id.* at 13:52–55) and "other communication
protocols which support two-way communication" (*Id.* at 14:3–5)
disclose that portable communications device 122 can be a telephone.
Petitioner relies upon Dr. Tygar's testimony that "[i]t was generally
known at the time that the ALOHA protocol could be used in two-way
cellular voice communications."  Ex. 1015 ¶ 10.  Even assuming that
to be true, though, it does not imply that every device capable of using
the ALOHA protocol, such as portable communications device 122, is
necessarily capable of two-way voice communication.

In view of the foregoing, we conclude that Petitioner has not
demonstrated by a preponderance of the evidence that Deluca
discloses a "cellular telephone," as required by claims 21 and 22.

### *Conclusion*

For the foregoing reasons, we determine that Petitioner has
established by a preponderance of the evidence that claims 1, 20, 30,
31, 67, 107, and 108 are unpatentable under 35 U.S.C. § 102(b) as

IPR2013-00391
Patent 6,857,067 B2

anticipated by Deluca, but has not established by a preponderance of the evidence that claims 21 and 22 are unpatentable under 35 U.S.C. § 102(b) as anticipated by Deluca.

## III.   CONCLUSION

We have considered the record before us in this *inter partes* review proceeding.  We conclude that Petitioner has met its burden of proof by a preponderance of the evidence in showing that claims 1, 20, 30, 31, 67, 107, and 108 of the '067 patent are unpatentable based upon the following grounds of unpatentability:

| Reference | Basis | Claims challenged |
|-----------|-------|-------------------|
| Cronce | § 102 | 67, 107, and 108 |
| Deluca | § 102 | 1, 20, 30, 31, 67, 107, and 108 |

We further conclude that Petitioner has not met its burden of proof by a preponderance of the evidence in showing that claims 21 and 22 are unpatentable under 35 U.S.C. § 102(b) as anticipated by Deluca.

## IV.   ORDER

Accordingly, it is

ORDERED that claims 1, 20, 30, 31, 67, 107, and 108 of the '067 patent are held unpatentable;

FURTHER ORDERED that claims 21 and 22 have not been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

26

IPR2013-00391
Patent 6,857,067 B2

For PETITIONER:

Eric A. Buresh, Esq.
Mark C. Lang, Esq.
Erise IP, P.A.
eric.buresh@eriseip.com
mark.lang@eriseip.com

For PATENT OWNER

Gregory S. Cordrey, Esq.
Jeffer Mangels Butler & Mitchell LLP
gcordrey@jmbm.com
gxc@jmbm.com

Sean D. Burdick, Esq.
Uniloc USA, Inc.
sean.burdrick@unilocusa.com